IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

MONIQUE RENEE JARRETT,               §
                                     §
        Plaintiff,                   §
                                     §
v.                                   §      Civil Action No. 3:12-CV-4044-BH
                                     §
CAROLYN W. COLVIN, ACTING            §
COMMISSIONER OF SOCIAL               §
SECURITY ADMINISTRATION,             §
                                     §
        Defendant.                   §

## MEMORANDUM OPINION AND ORDER

Pursuant to the consent of the parties and the order of reassignment dated December 28, 2012, this case has been transferred for the conduct of all further proceedings and the entry of judgment.  Before the Court are *Plaintiff's Motion for Summary Judgment*, filed February 15, 2013 (doc. 19) and *Defendant's Motion for Summary Judgment*, filed April 4, 2013 (doc. 24).  Based on the relevant filings, evidence, and applicable law, Plaintiff's motion is **GRANTED IN PART**, Defendant's motion is **DENIED**, and the case is **REMANDED** to the Commissioner for further proceedings.

## I.  BACKGROUND[2]

### A.   Procedural History

Monique Renee Jarrett (Plaintiff) seeks judicial review of a final decision by the Acting Commissioner of Social Security (Commissioner) denying her claims for supplemental security income (SSI) under Title XVI of the Social Security Act.  (R. at 9-18.)  Plaintiff applied for SSI on

---

[2]  The background information comes from the transcript of the administrative proceedings, which is designated as "R."

November 26, 2008, alleging disability beginning May 15, 2008.  (R. at 12.)  Her claim was denied

initially and upon reconsideration.  (*Id.*)  Plaintiff requested a hearing before an Administrative Law

Judge (ALJ), and personally appeared and testified at a hearing held on June 15, 2011.  (*Id.*)  On July

12, 2011, the ALJ issued a decision finding Plaintiff not disabled.  (R. at 9.)  Plaintiff appealed, and

the Appeals Council denied her request for review on August 29, 2012, making the ALJ's decision

the final decision of the Commissioner.  (R. at 1–6.)  Plaintiff timely appealed the Commissioner's

decision to the United States District Court pursuant to 42 U.S.C. § 405(g).  (*See* doc. 1.)

**B.**     **Factual History**

    **1.**     **Age, Education, and Work Experience**

Plaintiff was born on September 26, 1972. (R. at 86.)  At the time of the hearing before the

ALJ, she was 38 years old and had no past relevant work.  (R.  at 27, 47.)

    **2.**     **Medical Evidence**

On August 9, 2004, Plaintiff saw Dr. Samir Alsawah at Huron Medical Center for an initial

office consultation.  (R. at 373.)  She had gone to an emergency room the week before, and her

platelet count was down to between 20,000 and 30,000.  (*Id.*)  A doctor referred her to Dr. Alsawah.

(*Id.*)  Plaintiff  reported bruising easily the past few weeks, but the bruising had been present on and

off throughout her life.  (*Id.*)  On the day of the consultation, Plaintiff's platelet count was at 31,000.

(R. at 374.)  Dr. Alsawah diagnosed Plaintiff with moderately severe thrombocytopenia,[3] possibly

induced by her recent pregnancy.  (*Id.*)  He recommended that she continue taking 80 milligrams

of Prednisone per day.  (*Id.*)  Dr. Alsawah also recommended that Plaintiff monitor her platelet count

closely.  (*Id.*)

---

[3]A thrombocytopenia is "any disorder in which there is an abnormally low amount of platelets.  Platelets
are parts of the blood that help blood to clot.  This condition is sometimes associated with abnormal bleeding."
THROMBOCYTOPENIA, http://www.nlm.nih.gov/medlineplus/ency/article/000586.htm (last visited Mar. 25, 2014).

On September 7, 2004, Plaintiff saw Dr. Alsawah for a routine follow-up appointment.  (R. at 446.)  Plaintiff complained of slight fatigue but had been busy "running around" taking care of her children.  (*Id.*)  A physical examination showed normal conditions; her platelet count was at 222,000.  (*Id.*)  Dr. Alsawah's impression was idiopathic thrombocytopenic purpura (ITP),[4] hypothyroidism,[5] and slight fatigue.  (*Id.*)

On January 12, 2005, Plaintiff saw Dr. Alsawah for a routine follow-up appointment.  (R. at 445.)  She complained of very slight fatigue that she attributed to hypothyroidism.  (*Id.*)  Overall, however, Plaintiff "maintain[ed] good performance status and quality of life."  (*Id.*)  A physical examination showed normal conditions, and her ITP was fully resolved after Prednisone therapy.  (*Id.*)  Plaintiff's platelet count was at 212,000.  (*Id.*)

On June 6, 2006, Dr. Alsawah saw Plaintiff, and she complained of bruising, headache, and dizziness.  (R. at 443.)  A CT scan of her head and was apparently unremarkable.  (*Id.*)  Her platelet count had hit a low point of 16,000, but it was up to 35,000 on the day of the appointment.  (*Id.*)  A physical examination showed normal conditions, but Dr. Alsawah noted Plaintiff's recurrent ITP, suspected febrile syndrome, hypothyroidism, gastroesophageal reflux disease, extensive bruising due to ITP, and mild anemia.  (*Id.*)

On July 10, 2006, nurse practitioner Gretchen Altermatt (NP Altermatt) saw Plaintiff at Huron Medical Center.  (R. at 442.)  Plaintiff reported that she received her first dose of Winrho therapy on June 12, 2006; she tolerated the medication fairly well, although her platelet count was

---

[4]Idiopathic thrombocytopenic purpura is "a bleeding disorder in which the immune system destroys platelets, which are necessary for normal blood clotting.  Persons with the disease have too few platelets in the blood."  IDIOPATHIC THROMBOCYTOPENIC PURPURA, http://www.nlm.nih.gov/medlineplus/ency/article/000535.htm (last visited Mar. 25, 2014).

[5]Hypothyroidism is "a condition in which the thyroid gland does not make enough thyroid hormone.  This condition is often called underactive thyroid."  HYPOTHYROIDISM, http://www.nlm.nih.gov/medlineplus/ency/article/000353.htm (last visited Mar. 25, 2014).

low at 35,000.  (*Id.*)  Plaintiff reported that she was feeling well and had not noticed any bruising or bleeding as of date of the appointment.  (*Id.*)  She also noted that her menstrual cycle blood flow was normalized.  (*Id.*)  Plaintiff reported an ITP episode in January of 2004; she took Prednisone then but did not tolerate it well.  (*Id.*)  Her platelet count was at 220,000 on the day of the appointment.  (R. at 442, 482.)

On February 20, 2007, Plaintiff saw nurse practitioner Karen Dowden (NP Dowden) at Huron Medical Center.  (R. at 441.)  Plaintiff had petechiae[6] on her chest wall, and bruises on her chest and legs that were due to an accidental fall on the ice.  (*Id.*)  Plaintiff refused to take Prednisone, understanding that she took the risk of bleeding by not taking it.  (*Id.*)  Her platelet count was low at 37,000.  (*Id.*)  Plaintiff was to receive Winrho therapy at Port Huron Hospital within the week.  (*Id.*)

On February 28, 2007, Plaintiff saw NP Altermatt at Huron Medical Center.  (R. at 440.)  NP Altermatt noted that Plaintiff had a history of chronic recurrent ITP and had received Winrho therapy for it on June 6, 2006 and February 23, 2007.  (*Id.*)  Plaintiff stated that she did not want to take Prednisone due to its side effects, but that she tolerated Winrho therapy well.  (*Id.*)  Her platelet count increased from 37,000 to 178,000.  (*Id.*)

On March 21, 2007, Dr. Alsawah saw Plaintiff at Huron Medical Center.  (R. at 439.)  Plaintiff reported occasional bruising in the upper and lower extremities, but she "maintain[ed] fairly good performance status and quality of life."  (*Id.*)  A physical examination showed normal conditions; her platelet count was pending.  (*Id.*)

On May 30, 2007, Dr. Alsawah saw Plaintiff for a routine follow-up appointment.  (R. at

---

[6]Petechiae is defined as "pinpoint, round spots that appear on the skin as a result of bleeding under the skin."  PETECHIAE, http://www.mayoclinic.org/symptoms/petechiae/basics/definition/sym-20050724 (last visited Mar. 25, 2014).

438.)  Plaintiff complained of mild fatigue, but "overall maintain[ed] good performance status and quality of life and remain[ed] active."  (*Id.*)  Her physical exam was normal and her platelet count was at 248,000.  (*Id.*)

On October 8, 2007, Dr. Alsawah saw Plaintiff for a routine follow-up appointment.  (R. at 437.)  Plaintiff reported generalized fatigue that was stable and unchanged.  (*Id.*)  She denied any bruising or any other symptoms of thrombocytopenia; she also reported persistent intermittent headache, remedied by a medication.  (*Id.*)  A physical examination was unremarkable.  (*Id.*)  Her ITP had been in remission with last Winrho therapy in February of 2007.  (*Id.*)  Dr. Alsawah further noted Plaintiff's degenerative joint disease, migraine headache, gastroesophageal reflux disease, and hypothyroidism.  (*Id.*)

On February 8, 2008, Plaintiff saw Dr. Alsawah at Huron Medical Center.  (R. at 210.)  Dr. Alsawah noted that Plaintiff had chronic ITP, but it was clinically stable.  (*Id.*)  Plaintiff reported "chronic mild generalized fatigue[,]" but she maintained fairly good performance status and quality of life.  (*Id.*)  Physical examination was normal and her platelet count was 258,000.  (*Id.*)  Dr. Alsawah otherwise noted Plaintiff's degenerative joint disease, migraine headache, gastroesophageal reflux disease, and hypothyroidism.  (*Id.*)

On June 9, 2008, Plaintiff saw Dr. Alsawah for a routine follow-up appointment.  (R. at 209, 435.)  Plaintiff complained of occasional migraine headaches; she had no bruising or epistaxis and was maintaining fairly good performance status and quality of life.  (*Id.*)  A physical examination was unremarkable.  (*Id.*)  Her platelet count was 258,000.  (*Id.*)

On August 20, 2008, Plaintiff saw NP Altermatt for a routine follow-up appointment.  (R. at 433-34.)  Plaintiff had noticed bruising for the past few weeks and wanted her platelet count checked; it was low at 69,000.  (R. at 432, 434.)  NP Altermatt noted bruising on Plaintiff's arms.

- 5 -

(*Id.*)

On September 3, 2008, NP Altermatt saw Plaintiff for a routine follow-up appointment. (R. at 431-32.) Plaintiff had a history of chronic ITP, and her last treatment was administered in February of 2007. (R. at 432.) Two weeks prior, Plaintiff's platelet count was low at 69,000, but it had completely recovered by the time of the appointment. (*Id.*)

On September 22, 2008, Dr. Alsawah saw Plaintiff for a follow-up visit for her ITP. (R. at 206, 429-30.) Dr. Alsawah noted that Plaintiff had been diagnosed with ITP four years before and had recently been off medical therapy. (R. at 206, 430.) Her platelet count the month before was 69,000, and it spontaneously improved to 359,000 two weeks prior to the appointment. (*Id.*) On the day of appointment, her platelet count was decreased to 136,000. (*Id.*) Dr. Alsawah recommended continued observation but no medical therapy. (*Id.*)

On October 22, 2008, Dr. Alsawah saw Plaintiff for a routine follow-up visit. (R. at 205, 427-28.) Dr. Alsawah noted that Plaintiff had spontaneously recovered from ITP, and there was no bleeding or easy bruising. (R. at 205, 428.) Plaintiff, however, was slightly depressed and showed symptoms of gastroestophageal reflux disease. (*Id.*)

On November 17, 2008, Plaintiff saw nurse practitioner Gretchen Strauchman (NP Strauchman) at Huron Medical Center. (R. at 204, 425-26.) NP Strauchman noted Plaintiff's history of ITP. (R. at 204, 426.) Plaintiff complained of significant petechiea on her trunk, arms, and legs. (*Id.*) Plaintiff noted that she had been on steroids in the past, but that she experienced extreme mood fluctuations on Prednisone. (*Id.*) Plaintiff's platelet count was at a low of 16,000. (*Id.*) Plaintiff agreed to a short-term dose of Prednisone therapy and was given a dosage of 60 milligrams daily. (*Id.*)

On November 21, 2008, Plaintiff presented to the emergency room at St. Joseph Mercy Port

Huron in Port Huron, Michigan, for numbness on her right side.  (R. at 163.)  She had a platelet count of 21,000, and she was hospitalized and started on 60 milligrams of Prednisone.  (R. at 163.)  When Dr. Alsawah saw her the next day, Plaintiff was weak and tired, but had no numbness; she was able to stand and walk.  (R. at 163.)  Her platelet count increased to 27,000.  (*Id.*)  He noted that Plaintiff had responded "very well to steroids in the past and has not had any significant problems with other hematological abnormalities[.]"  (*Id.*)  He also noted that due to a recent recurrence of ITP, Plaintiff was prescribed Prednisone at 60 milligrams daily, but due to Plaintiff's reluctance and her gastric upset, she took 20-30 milligrams per day instead.  (R. at 163.)  Prior to the hospitalization, Plaintiff was on 10 milligrams of Prednisone daily.  (*Id.*)  He opined that medical findings were "highly suggestive of acute thrombotic thrombocytopenic purpura (TTP)."[7]  (R. at 164.)  He also noted Plaintiff's history of chronic ITP, gastroesophageal reflux disease, hypothyroidism, and mild depression.  (*Id.*)

On November 21, 2008, Dr. Jere Baldwin completed an ED Clinical Worksheet.  (R. at 171-74.)  Plaintiff reported right-side numbness, history of ITP, and vomiting on and off for the past three weeks.  (R. at 171.)  Dr. Baldwin noted that Plaintiff's condition was normal except that she easily bruised and bled.  (R. at 172.)  When she was discharged, the discharge diagnosis was ITP, transient ischemic attack,[8] and reduced potassium.  (R. at 174, 180.)  A CT scan done on the same day showed no acute abnormality, and an x-ray showed no acute process.  (R. at 184-85.)

The next day, on November 22, 2008, Plaintiff was admitted to Detroit Medical Center for

---

[7]Thrombotic thrombocytopenic purpura is "a blood disorder that causes blood clots to form in small blood vessels around the body, and leads to a low platelet count."  THROMBOTIC THROMBOCYTOPENIC PURPURA, http://www.nlm.nih.gov/medlineplus/ency/article/000552.htm (last visited Mar. 25, 2014).

[8]A transient ischemic attack (TIA) is "when blood flow to a part of the brain stops for a brief period of time. A person will have stroke-like symptoms for up to 24 hours, but most cases for 1-2 hours."  TRANSIENT ISCHEMIC ATTACK, http://www.nlm.nih.gov/medlineplus/ency/article/000730.htm (last visited Mar. 25, 2014).

possible TTP.  (R. at 191.)  Her platelet count was low at 21,000 on November 21, 2008, and at 27,000 on November 22, 2008.  (R. at 471, 474.)  On November 23, 2008, Plaintiff was shifted to the intensive care unit (ICU) and was started on plasmapheresis[9] daily.  (R. at 192.)  Her chest x-ray showed no pneumonia, pneumothorax or effusion.  (R. at 196.)  She was given 60 milligrams of Prednisone daily.  (R. at 192.)  Plaintiff was diagnosed with TTP and discharged on November 26, 2008, with a platelet count of 251,000.  (*Id.*)

On December 3, 2008, Plaintiff had a followup appointment with Dr. Jesus Ortega.  (R. at 198.)  Dr. Ortega noted that Plaintiff had received four sessions of plasmapheresis and responded very well to steroids.  (R. at 198.)  Due to her nervousness, however, Plaintiff reduced Prednisone dosage from 60 milligrams daily to 20 milligrams daily.  (*Id.*)  She was feeling well at the time of the appointment.  (*Id.*)  Her platelet count was up to 522,000.  (R. at 199.)  Dr. Ortega noted that Plaintiff had a recent episode of ITP, but was in remission at the time, and he instructed her to continue with the Prednisone therapy at 20 milligrams daily.  (R. at 199.)

On December 10, 2008, Dr. Ortega saw Plaintiff again.  (R. at 201.)  She had no complaints and was doing well except for weight gain.  (*Id.*)  She reported that she had a very good appetite and no pains, headaches, or any complaints.  (*Id.*)  Dr. Ortega opined that Plaintiff was on remission from "her episode of [TTP]."  (R. at 202.)  He reduced her Prednisone to 15 milligrams daily.  (*Id.*)

On January 5, 2009, Plaintiff was seen by NP Strauchman for a routine follow-up appointment.  (R. at 203, 424.)  NP Strauchman noted that Plaintiff was diagnosed with acute TTP. (*Id.*)  Plaintiff reported that she was on 10 milligrams of Prednisone daily and that she tolerated it

---

[9]A plasmapheresis is defined as "a process for removing blood plasma without depleting the donor or patient of other blood constituents (as red blood cells) by separating out the plasma from the whole blood and returning the rest to the donor or patient's circulatory system."  PLASMAPHERESIS, http://www.merriam-webster.com/dictionary/plasmapheresis (last visited Mar. 25, 2014).

fairly well.  (*Id.*)  Prednisone caused some mood fluctuations, however, and she wanted to reduce it.  (*Id.*)  "She [had] no other complaints other than some generalized weakness. . . . [and] weight gain since starting the steroids."  (*Id.*)  NP Strauchman instructed Plaintiff to decrease her Prednisone dosage to 5 milligrams daily.  (*Id.*)

On January 22, 2009, Plaintiff saw Dr. Alsawah for a routine follow-up appointment.  (R. at 421-22.)  Dr. Alsawah noted Plaintiff's recent episode of TTP, from which she fully recovered, and her chronic ITP.  (R. at 422.)  The origin of TTP could not be identified.  (*Id.*)  Plaintiff was feeling fairly well on the day of the appointment.  (*Id.*)  Dr. Alsawah recommended that she continue taking Prednisone at 5 milligrams daily and opined that no further treatment of TTP was required. (*Id.*)

On February 12, 2009, Dr. Alsawah saw Plaintiff for a routine follow-up appointment.  (R. at 419-20.)  Plaintiff reported chest pain, generalized fatigue, and shortness of breath.  (R. at 420.)  Against the advice of her doctor, Plaintiff had weaned herself off of Prednisone from the last dosage of 5 milligrams per day.  (R. at 420.)  Dr. Alsawah found that Plaintiff's EKG showed no ischemic changes, and she had normal sinus rhythm, and her platelet count was 286,000.  (*Id.*)  Dr. Alsawah asked Plaintiff to continue to take Prednisone.  (*Id.*)

On February 25, 2009, NP Strauchman saw Plaintiff for a routine follow-up appointment. (R. at 417-18.)  Plaintiff reported that aside from mild fatigue, she was doing well and no longer on Prednisone.  (R. at 418.)  NP Strauchman saw no change in Plaintiff's condition.  (R. at 417.)

On March 16, 2009, Muhammad Ahmed, M.D., a state agency medical consultant (SAMC), reviewed Plaintiff's medical evidence and assessed her physical Residual Functional Capacity (RFC).  (R. at 213-20.)  He opined that Plaintiff had the following physical RFC: lift 20 pounds occasionally and 10 pounds frequently; stand and walk for at least six hours in an eight-hour

workday; sit for six hours in an eight-hour workday; push and pull an unlimited amount of weight; and no postural, manipulative, visual, communicative, or environmental limitations.  (R. at 214-20.) He acknowledged Plaintiff's history of ITP and hypothyroidism, with the last episode occurring in November 2008.  (R. at 220.)  Plaintiff had limitations of weakness and fatigue, consistent with her medical condition.  (*Id.*)  Dr. Ahmed concluded, however, that Plaintiff's "impairments would not limit her ability to perform work related activities 8 hours a day 5 days a week on a sustained basis[.]"  (*Id.*)

On March 25, 2009 and April 8, 2009, Plaintiff saw NP Strauchman for routine follow-up appointments.  (R. at 413-16.)  Plaintiff reported that other than a mild fatigue, she was doing well and was not on Prednisone.  (R. at 414, 416.)  NP Strauchman saw no change in Plaintiff's condition.  (R. at 413, 415.)

On April 22, 2009, Dr. Alsawah saw Plaintiff for a routine follow-up appointment.  (R. at 407.)  He observed that Plaintiff was maintaining a good performance status and quality of life.  (R. at 408.)  Her physical examination was unremarkable.  (*Id.*)  Dr. Alsawah noted that Plaintiff's ITP was clinically stable, and that there was no evidence that TTP was a recurrent disease; she was in complete remission.  (*Id.*)

On April 30, 2009, Plaintiff had a bone density study.  (R. at 485.)  Her bone density was found to be normal.  (*Id.*)

On May 20, 2009, Plaintiff saw NP Strauchman for a routine follow-up appointment.  (R. at 411-12.)  Plaintiff reported that she was doing well, and that although she suffered from chronic fatigue, she was no longer on Prednisone.  (R. at 412.)  NP Strauchman found there was no change in Plaintiff's condition.  (R. at 411.)

On June 24, 2009, NP Strauchman saw Plaintiff for a routine follow-up appointment.  (R.

at 409-10.)  Plaintiff was not on Prednisone, but she continued to have chronic fatigue.  (R. at 410.)
She had discontinued her antihypertensive medication because it caused dizziness, and she did not
inform her primary care physician about it.  (*Id.*)

On July 27, 2009, Dr. Alsawah saw Plaintiff for a routine follow-up appointment.  (R. at 405-06.)  Plaintiff reported that she felt reasonably well with chronic fatigue; overall she was maintaining
good performance status and quality of life and kept an active life.  (R. at 406.)  Dr. Alsawah noted
that her ITP was without recurrences and that she had an TTP treatment in November 2008.  (*Id.*)

On September 2, 2009, NP Strautchman saw Plaintiff for a routine follow-up appointment.
(R. at 404.)  Plaintiff reported that she continued feeling well, although she had chronic fatigue.
(*Id.*)

On September 15, 2009, NP Dowden saw Plaintiff for an acute visit.  (R. at 402.)  NP
Dowden noted that Plaintiff had suffered acute TTP in November of 2008, but it was resolved and
had not recurred.  (*Id.*)  At the time of the visit, Plaintiff had been suffering from a headache for five
days and was sure she had a recurrence of her ITP.  (*Id.*)  She was reassured that she was completely
normal, and her platelet count was at 253,000.  (*Id.*)

On September 18, 2009, Dr. Alsawah saw Plaintiff for a routine follow-up appointment.  (R.
at 399.)  Plaintiff reported that she had been under a significant amount of stress and suffered
debilitative numbness in her both hands, fatigue, and hematuria.  (R. at 400.)  Her test results were
normal, however, and Dr. Alsawah noted that Plaintiff's chronic ITP was in total remission.  (*Id.*)

On September 21, 2009, Dr. Alsawah saw Plaintiff for a routine follow-up appointment.  (R.
at 397.)  He noted that Plaintiff had no recent activation for TTP and ITP.  (R. at 398.)  Plaintiff did
report excessive generalized fatigue on top of her chronic depression.  (*Id.*)

On October 7, 2009, NP Strauchman saw Plaintiff for a routine follow-up appointment.  (R.

at 395.)  Plaintiff's platelet count had been running relatively normal and she declined to take any medication "because she [was] mostly asymptomatic."  (R. at 396.)  NP Strauchman noted that Plaintiff had ITP without progression and TTP without reactivation.  (*Id.*)

On November 9, 2009, NP Strauchman saw Plaintiff for a routine follow-up appointment. (R. at 393.)  Although she complained of chronic headaches, an MRI showed that everything was normal.  (R. at 394.)  Plaintiff had been "feeling pretty good."  (*Id.*)  NP Strauchman noted that Plaintiff had ITP without progression and TTP without reactivation.  (*Id.*)

On November 30, 2009, NP Strauchman saw Plaintiff for a routine follow-up appointment. (R. at 391.)  Plaintiff's platelet count had been running relatively normal, but she had been diagnosed with the H1N1 flu a few weeks prior.  (R. at 392.)  Dr. Raymond, her primary care physician, prescribed her Tamiflu, and Plaintiff wanted to get her platelet count checked to see whether Tamiflu affected it.  (*Id.*)  A lab test showed a normal platelet count.  (*Id.*)

On December 14, 2009, NP Strauchman saw Plaintiff for a routine follow-up appointment. (R. at 389.)  Plaintiff's platelet count had been running normal; she reported feeling well and had no complaints.  (R. at 390.)

On January 7, 2010, Dr. Alsawah conducted a followup visit for Plaintiff's ITP and TTP. (R. at 387.)  He noted a chronic ITP with slight progression, and Plaintiff reported that she had low-grade fever.  (R. at 388.)  Although she did very well while she was visiting her mother in Dallas Texas, she reported that Dr. Raymond had told her that she had a viral infection.  (*Id.*)

On January 9, 2010, Plaintiff arrived at the emergency room of St. Joseph Mercy Port Huron in an ambulance.  (R. at 348.)  She complained of fever and a low platelet count of 14,000.  (R. at 348, 353.)  Plaintiff was discharged on the same date.  (R. at 366.)

On January 11, 2010, Dr. Alsawah conducted a follow up visit for Plaintiff's ITP.  (R. at

385.)  He noted that Plaintiff had developed "rapidly progressive ITP after her last visit."  (R. at 386.)  She was prescribed Prednisone at a dose of 60 milligrams daily.  (*Id.*)  Plaintiff was feeling "reasonably well," and reported that "most of her upper respiratory symptoms have resolved."  (*Id.*)  She tolerated Prednisone well and reported no new bruising.  (*Id.*)  Dr. Alsawah recommended that she continue to take 60 milligrams of Prednisone per day.  (*Id.*)

On January 18, 2010, Plaintiff presented at the emergency room of St. Joseph Mercy Port Huron complaining of acute abdominal pain, nausea, and vomiting.  (R. at 223.)  An ultrasound showed "two small gallstones[.]"  (R. at 232.)  On January 19, 2010, Plaintiff underwent a cholecystectomy to remove her gallbladder.  (R. at 223, 253-54.)  Dr. Alsawah saw her during the hospitalization.  He observed her history with ITP and TTP without recurrence, but noted that Plaintiff was very healthy and led a very active and healthy lifestyle, taking care of her four daughters.  (R. at 233, 238.)  Plaintiff's condition improved after the cholecystectomy, and she was discharged on January 20, 2010, in a stable condition.  (R. at 223-24.)  Her platelet count was at 420,000.  (R. at 224.)

On January 27, 2010, NP Strauchman saw Plaintiff for a follow-up appointment for her ITP and TTP.  (R. at 384.)  Although Plaintiff was sent home with a 60 milligram daily dosage of Prednisone, she had weaned herself down to 30 milligrams per day because she could not tolerate the higher dosage.  (*Id.*)  Upon consultation with Dr. Alsawah, Plaintiff was permitted to reduce the dosage of Prednisone to 20 milligrams per day.  (*Id.*)

On February 2, 2010, Dr. Alsawah conducted a follow-up visit for Plaintiff's ITP and found no changes in her condition.  (R. at 381.)  He noted that she had undergone a procedure to remove her gallbladder, and she was feeling a lot better "with improvement in performance status and quality of life."  (R. at 382.)  Plaintiff's hemoglobin was stable at 187,000, and she was taking 20

- 13 -

milligrams of Prednisone daily.  (*Id.*)

On February 9, 2010, Dr. Alsawah conducted a follow-up visit for Plaintiff's ITP, and TTP and found no changes in her condition.  (R. at 379.)  He noted her history of ITP and one episode of TTP.  (R. at 380.)  He also noted that Plaintiff was maintaining "good performance status and quality of life."  (*Id.*)

On February 23, 2010, Dr. Alsawah conducted a follow- up visit for Plaintiff's ITP and TTP. (R. at 377.)  Plaintiff was on 15 milligrams of Prednisone per day for reactivation of ITP.  (R. at 378.) Dr. Alsawah noted that Plaintiff was maintaining "good performance status and quality of life and remain[ed] fully active."  (*Id.*)

On March 16, 2010, Dr. Alsawah conducted a follow-up visit for Plaintiff's ITP and TTP. (R. at 375.)  Plaintiff's ITP was stable, and her TTP was in remission.  (R. at 376.)  Plaintiff reported that she felt "reasonably well," and she maintained "good performance status and quality of life and remain[ed] fully active."  (*Id.*)  Plaintiff was on 10 milligrams of Prednisone daily.  (*Id.*)

On November 10, 2010, Plaintiff presented herself at Lake Pointe Medical Center to establish care with Dr. Denise Johnson in Texas.  (R. at 492-94.)  Her chief complaint was low platelet count.  She had noticed oral petechiae for four to five days, her gums had been bleeding for over a month, and her menstrual cycle had been heavier for the past few months.  (R. at 493.)  The results of a physical examination were essentially normal, but a blue hematoma on her right thigh and a purpuric lesion on her right hand were observed.  (R. at 493-94.)

On November 11, 2010, Dr. Kim-Ngan P. Fellman saw Plaintiff at Lake Pointe Medical Center due to her low platelet count, which was at 18,000.  (R. at 498-500.)  A physical exam yielded normal results.  (R. at 499.)  Dr. Fellman noted Plaintiff's history of ITP, TTP, and her low platelet count, and he decided to consult with a hematologist for further treatment.  (*Id.*)  Dr. Fellman

- 14 -

decided to increase her Synthroid dose for her hypothyroidism and to continue treatment with Maxalt for her migraine. (*Id.*) He observed that Plaintiff's depression was stable. (*Id.*)

On November 15, 2010, Plaintiff presented herself at Lake Pointe Medical Center for a routine follow-up visit with Dr. Johnson. (R. at 495-97.) A physical examination showed Plaintiff's condition was normal, and her petechiae were resolving. (R. at 496.) Plaintiff was taking a medrol dose pack and declined Prednisone. (*Id.*) Dr. Johnson concluded that Plaintiff's ITP was improving, her primary thrombcytopen was improving, and she had hypothyroidism and high blood pressure. (*Id.*) It was recommended that Plaintiff continue her medication and therapy. (*Id.*)

### 3. Hearing Testimony

On June 15, 2011, Plaintiff, her aunt Lorraine Kaminski and a Vocational Expert (VE) testified at a hearing before the ALJ. (R. at 22-49.) Plaintiff was represented by an attorney. (R. at 24.)

#### a. *Plaintiff's Testimony*

Plaintiff testified that she was 38 years old and had four children. (R. at 27.) Plaintiff was diagnosed with ITP in 2005, when she had her tubal ligation. (R. at 27.) During the operation, she bled out and was unconscious for an unknown amount of time. (R. at 27-28.) Plaintiff described ITP and TTP as "a platelet disorder," a disease of one's immune system. (R. at 28.) The symptoms of ITP were migraines, bruising under the skin, and occasional high blood pressure. (R. at 28.) ITP caused Plaintiff to develop TTP, causing strokes. (R. at 28.) Plaintiff had two strokes stemming from TTP, one in 2005 and another in 2008. (R. at 29.) As a result, Plaintiff had reduced grip strength in her right hand. (R. at 29-30.) The disease suppressed Plaintiff's immune system, but the prescription medication she had to take for it, Prednisone, also made her highly susceptible to germs and bacteria. (R. at 30.) When she caught someone's cold, it quickly dropped her platelet count

within 24 hours and caused internal bleeding and blood blisters in her mouth.  (R. at 30.)  This also affected her energy level, and she was chronically tired.  (R. at 30, 33.)  The side effects of Prednisone also made her extremely moody and depressed.  (R. at 31.)  The medicine also took calcium from her bones, and she had a broken teeth as a result.  (R. at 31.)  It also caused her to either sleep for a prolonged period of time or stay awake for several days, making her very irritable.  (R. at 31.)  Plaintiff's condition was so bad that she could not function two or three days in a month, exclusive of getting sick or her monthly menstrual cycle.  (R. at 32.)  Plaintiff could not be exposed to the public, especially during flu and cold season, and even her children had to take their clothes off and wash themselves when they returned home from school in order to protect her from germs.  (R. at 32.)  In November, Plaintiff's platelet count was 18,000, and she was sent to an emergency room.  (R. at 33.)  Her condition was chronic.  (R. at 34.)

### b.    Aunt's testimony

Plaintiff's aunt testified at the hearing.  (R. at 34.)  She learned that when Plaintiff went to the hospital for a tubal ligation in 2008, Plaintiff almost bled to death, and subsequent tests revealed that Plaintiff's ITP had turned into TTP.  (R. at 36.)  Plaintiff was released from the hospital because her condition was under control through Prednisone.  (R. at 37.)  Prednison caused Plaintiff to "become[] like an animal[,]" but she was required to take it to prevent her immune system from attacking her.  (R. at 37-38.)  The aunt testified that when Plaintiff took Prednisone, she was easily angered and at times exploded at her children.  (R. at 38.)  She further testified that Plaintiff became delirious when she took Prednisone.  (R. at 44.)  When the ALJ asked how often Prednisone had that effect on Plaintiff, the aunt testified that when she observed Plaintiff at the hospital, it lasted at least 24-48 hours.  (R. at 44.)  Plaintiff's attorney clarified that such delirium occurred when Plaintiff was on a high dose of Prednisone.  (R. at 44-45.)  When Plaintiff was on a maintenance dose, it

- 16 -

suppressed her immune system and caused insomnia, nightmares, and a low level of energy due to lack of sleep.  (R. at 45.)

### c.       *Vocational Expert testimony*

A vocational expert (VE) also testified at the hearing.  (R. at 46-48.)  She testified that Plaintiff had no substantial gainful activity.  (R. at 46.)  Plaintiff worked in 2004 as an office manager, but only made $6,600 for the entire year.  (R. at 46-47.)  The ALJ concluded that Plaintiff had no past relevant work.  (R. at 47.)  The ALJ asked the VE to opine whether a hypothetical person with Plaintiff's age and education with the following limitations could perform work : lift and carry 20 pounds occasionally and 10 pounds frequently; stand and walk for six of eight hours; sit for six of eight hours; restricted to clean-air environment and full-seizure precautions to accommodate the effects of medication.  (R. at 47.)  The VE testified that the hypothetical person could perform some light and unskilled occupations, such as a mail clerk (light, unskilled, SVP-2, DOT 209.687-026), with 1,400 jobs in Texas and 15,000 jobs in the national economy; photocopy and machine operator (light, unskilled, SVP-2, DOT 207.685-015), with 1,650 jobs in Texas and 18,000 in the national economy; and a telephone quotation clerk (sedentary, unskilled, SVP-2, DOT 237.367-046), with 6,000 jobs in Texas and 83,000 in the national economy.  (R. at 47-48.)  In response to a question by the ALJ, the VE stated that her testimony was consistent with the job as described in the dictionary of occupational titles (DOT).  (R. at 48.)

When Plaintiff's counsel asked the VE whether most jobs required a person to not miss more than 12 days out of a year to maintain employment, the VE answered in the affirmative.  (R. 48.)

## C.      ALJ's Findings

The ALJ issued her decision denying benefits on July 12, 2011.  (R. at 9-18.)  At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since her application date

of November 26, 2008.  (R. at 14.)  At step two, she determined that Plaintiff had five severe impairments: petechiae, hypothyroidism, ITP, fibromyalgia, and depression.  (*Id.*)  Despite those impairments, at step three, she found that no impairment or combination of Plaintiff's impairments satisfied the criteria of any impairment listed in the social security regulations.  (*Id.*)  The ALJ next determined that Plaintiff retained the following RFC: lift and carry 10 pounds frequently and 20 pounds occasionally; stand and walk for six hours in an eight-hour workday; sit for six hours in an eight-hour workday; "no exposures to polluted environments or respiratory irritants and no work around harzardous machinery, at unprotected heights, climbing ladders, driving a motor vehicle or on vibrating surfaces."  (R. at 15.)  She could perform simple tasks.  (*Id.*)  At step four, the ALJ determined that "[t]ransferablity of job skills is not an issue because [Plaintiff] does not have past relevant work."  (R. at 17.)  At step five, with the testimony of the VE, the ALJ determined that there were jobs existing in significant numbers in the national economy that she could perform, such as mail clerk, with 1,400 positions in Texas and 15,000 in the national economy; photocopy machine operator, with 1,650 positions in Texas and 18,000 in the national economy; and telephone quotation clerk, with 600 positions in Texas and 8,300 in the national economy.  (R. at 17.)  Accordingly, the ALJ determined that Plaintiff was not disabled within the meaning of the Social Security Act at any time between her alleged onset date and the date of the ALJ's decision.  (R. at 18.)

## II.  ANALYSIS

### A.    Legal Standards

#### 1.       Standard of Review

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence.  *Greenspan v. Shalala*, 38 F.3d 232, 236

(5th Cir. 1994); 42 U.S.C. § 405(g), 1383(C)(3). Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence supports the Commissioner's decision. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985). Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *See id*. Therefore, the Court may rely on decisions in both areas, without distinction, when reviewing an ALJ's decision. *See id*.

### 2.      Disability Determination

To be entitled to social security benefits, a claimant must prove he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563–64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step analysis to determine whether a claimant is disabled:

1.      An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2.      An individual who does not have a "severe impairment" will not be found to be disabled.

3.      An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4.      If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5.      If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f) (currently 20 C.F.R. § 404.1520(a)(4)(i)-(v) (2012)). Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id.* Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). After the Commissioner fulfills this burden, the burden shifts back to the claimant to show that he cannot perform the alternate work. *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005). "A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis." *Loveland v. Bowen*, 813 F.2d 55, 58 (5th Cir.

1987).

**B.    Issues for Review**

Plaintiff presents the following issues for review:

(1)    Does the Decision include the required finding and reviewable evaluation of the side-effects of Plaintiff's medical treatment?  Alternatively, is the ALJ's implicit finding that her ITP treatment causes no side-effects supported by substantial evidence?

(2)    Does the ALJ's failure to evaluate the credibility of the testimony of the third-party witness, Lorraine Kaminski, (or to mention her testimony at all) justify remand?

(3)    Did the ALJ evaluate Plaintiff's migraines in the manner required by law?

(4)    Are Plaintiff's blood diseases episodic in nature, such that the ALJ's failure to follow the rule of *Singletary v. Bowen* in this case requires remand?

(Doc. 20 at 7.)

**C.    Medication Side Effects**

Plaintiff first argues the ALJ failed to consider the side effects of her medication, Prednisone, in making her disability determination.  (Doc. 20 at 18-22.)  Plaintiff contends that this failure resulted in an inaccurate RFC assessment, which precluded the VE from considering her explosive and extreme mood swings when recommending potentially suitable jobs.  (Doc. 20 at 21.)

As part of the disability determination, the ALJ is required to consider "the type, dosage, effectiveness, and side effects of any medication [the claimant] take[s] or ha[s] taken to alleviate pain or other symptoms."  *Crowley v. Apfel*, 197 F.3d 194, 199 (5th Cir. 1999) (alterations in original) (citing 20 C.F.R. § 404.1539(c)(3)(iv)); *see also* SSR 96-7p.  SSR 96-8p also directs that "the RFC assessment must be based on all of the relevant evidence in the case record, including the effects of treatment and the limitations or restrictions imposed by the mechanics of treatment; e.g., frequency of treatment, duration, disruption to routine, side effects of medication."  *Brown v.*

*Barnhart*, 285 F.Supp.2d 919, 935 (S.D. Tex. 2003) (internal quotation marks omitted). Consequently, when a claimant complains of medication side effects, and the ALJ fails to evaluate those side effects and their impact on the claimant's RFC, the ALJ commits error. *Id.*

### a. Prednisone Side Effects

Here, Plaintiff testified that Prednisone made her "extremely moody" and depressed. (R. at 31.) She said that it made her feel crazy, depending on the dosage. (*Id.*) Prednisone also made her either sleep for an extended period of time, or it kept her awake for two to three days, especially on a high dosage. (*Id.*) Her aunt also testified that Prednisone made Plaintiff like an animal in that she became outraged and angry very easily. (R. at 37-38.) Plaintiff had very bad mood swings and became delirious. (R. at 38, 44.) Plaintiff's medical record corroborated the testimony; she continually complained of the negative side effects of Prednisone. (R. at 163, 198, 203-04, 384, 424, 426, 440-42, 496.) She claimed that Prednisone caused extreme mood fluctuations and nervousness, even when she was on a low dosage, so her doctor decreased her dosage even further. (R. at 198, 204, 426.) There were also times when she flat out refused to take Prednisone, taking the risk of bleeding out, because of the negative side effects. (R. at 440-41, 496.)

Although the ALJ's decision mentioned that Prednisone kept Plaintiff awake for days, it made no specific findings regarding Plaintiff's other asserted side effects, i.e, extreme mood swings, explosive temper, and inability to stay awake. (R. at 15-16.) In fact, the ALJ found in her RFC determination that Plaintiff had essentially no restrictions related to her social functioning. (R. at 15.) The lack of finding makes it impossible to determine whether the ALJ properly considered the side effects. *Harrison v. Colvin*, No. 3:13-CV-2851-D, 2014 WL 982843, at *12 (N.D. Tex. Mar. 12, 2014) ("Without a specific finding regarding [Plaintiff's] subjective complaints about [the side effects], the court cannot determine whether the ALJ properly considered the side effects of

- 22 -

[Plaintiff's] pain medication in making his RFC determination.") (Fitzwater, C.J.).   The ALJ committed error by failing to make specific findings on the side effects of Plaintiff complained.  *See Tims v. Astrue*, No. G-09-1842, 2010 WL 3359475, at *7 (S.D. Tex. Aug. 24, 2010) ("[T]he ALJ failed to analyze the side effects of medications and/or the impact of such side effects on [Plaintiff's] ability to maintain competitive employment.")

### b.      Harmless Error Analysis

The Court must still consider whether the ALJ's failure to properly evaluate the Prednisone side effects was harmless.  *See Harrison*, 2014 WL 982843, at *13 (applying harmless error analysis to the ALJ's failure to properly evaluate the medication side effects).   In the Fifth Circuit, harmless error exists when it is inconceivable that a different administrative conclusion would have been reached absent the error.  *Bornette v. Barnhart*, 466 F. Supp. 2d 811, 816 (E.D. Tex. 2006) (citing *Frank v. Barnhart*, 326 F.3d 618, 622 (5th Cir. 2003)).

Here, consideration of the alleged side effects of Prednisone on Plaintiff, i.e., extreme mood swings, explosive temper, and inability to stay awake at times, could have affected the ALJ's RFC determination, particularly as it related to Plaintiff's social limitations.   A different RFC finding could have changed the outcome of this case.  *Harrison*, 2014 WL 982843, at *13 (citing to *Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir. 1988)) ("Had the ALJ considered [the side effects] and found it to be credible, such finding could affect [Plaintiff's] RFC and, ultimately, the ALJ's decision regarding whether [Plaintiff] was disabled as defined under the Act.").   Because it is not inconceivable that a different disability determination would have been reached, *see Bornette*, 466 F.Supp.2d at 816, the ALJ's error was not harmless and requires remand.[10]

---

[10]   On remand, the ALJ's evaluation and discussion of the side effects of Prednisone on Plaintiff in determining Plaintiff's RFC could affect the determination of the remaining issues.  Accordingly, the remaining issues are not addressed at this time.

### III.  CONCLUSION

Plaintiff's motion is **GRANTED IN PART**, Defendant's motion is **DENIED**, and the case is **REMANDED** to the Commissioner for further proceedings.

**SO ORDERED** on this 31st day of March, 2014.


IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

- 24 -